IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| Tracy N. In Her Capacity As Parent and Legal Guardian of Nickalas N., | ) ) ) ) | Civ. No. 09-00513 ACK-LEK |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Department of Education, State of Hawaii, | ) ) ) | |
| Defendant. | ) | |

_____

ORDER AFFIRMING THE HEARING OFFICER'S DECISION

BACKGROUND

I.   Legal Background

The Individuals with Disabilities Education Act ("IDEA") was enacted by Congress to, among other things, "ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A) & (B).  The IDEA provides federal money to state and local education agencies to assist them in educating disabled children, on the condition that the state and local agencies implement the substantive and procedural requirements of

1

the IDEA.  See Robb v. Bethel Sch. Dist. #403, 308 F.3d 1047, 1049 (9th Cir. 2002).

Under the IDEA, state and local education agencies are required to identify children with disabilities and develop an annual individualized education program ("IEP") for every child. 20 U.S.C. § 1414.  An IEP is a comprehensive document developed by a team of parents, teachers, and other school administrators setting out the goals for the child, and designating the special education and related services that are necessary to reach those goals.  Id. § 1414(d).  The IDEA also provides procedural safeguards to permit parental involvement in all matters concerning the child's educational program, including an opportunity for an impartial due process hearing for complaints, and allows parents to obtain administrative and judicial review of decisions they deem unsatisfactory or inappropriate.  Robb, 308 F.3d at 1049.

## II.  Procedural Background

Tracy N. ("Mother"), in her capacity as parent and legal guardian of Nickalas N. ("Student") (collectively "Plaintiffs"), have sued the State of Hawai'i, Department of Education ("DOE" or "Defendant"), for allegedly denying Student the FAPE to which he is entitled under the IDEA, 20 U.S.C. §§ 1400-1487 (2005).

On November 7, 2008, Plaintiffs commenced the complaint

2

process by requesting an administrative hearing with the DOE, pursuant to the IDEA.  The hearing occurred over three days, July 22-24, 2009.  The parties submitted their closing briefs in writing on September 11, 2009.  The administrative proceedings culminated with the Hearing Officer's issuance of Findings of Fact, Conclusions of Law and Decision on September 23, 2009 ("Admin. Decision").  The Hearing Officer concluded that Student had been provided a FAPE for the years challenged, and thus, determined that Plaintiffs were not entitled to reimbursement for the unilateral placement of Student at the Private Placement School.

Dissatisfied with the conclusions of the Hearing Officer, Plaintiffs filed suit in this Court pursuant to 20 U.S.C. § 1415(i)(2)(A) on October 23, 2009 ("Complaint"). Defendant filed its Answer to Plaintiffs' Complaint on November 13, 2009 ("Answer").

The Court received the Administrative Record on Appeal on December 11, 2009.  The complete record is comprised of the following four components: (1) Administrative Record on Appeal ("Hearing Record"); (2) Petitioners' Exhibits 1-47;[1] (3) Respondent's Exhibits 1-75; and (4) Transcript of Administrative Hearing (four volumes, "Tr.").

_____

[1] The Petitioners in the Administrative Proceeding are the Plaintiffs in this appeal and the Respondent below is the Defendant here.

Plaintiffs filed their Opening Brief on March 15, 2010 ("Opening Brief").  Defendant filed an Answering Brief on April 12, 2010 ("Answering Br.").  On May 3, 2010, Plaintiffs filed a Reply Brief in Response to Defendant's Answering Brief ("Reply Br.").[2/]

The Court held oral argument on the appeal on May 11, 2010.

## III. Factual Background

Nickalas N. is a student who is eligible to receive special education pursuant to the IDEA.  Student became eligible for special education while he was living in the state of Washington.  Resp. Ex. 14.  Student moved to Hawai'i in 2005.  Tr. at 275:24-25.

A.   Education in Washington State

Student was born on December 7, 1994.  When Student was approximately six years old, Student's parents divorced.  Admin. Decision ¶ 1; Tr. at 270:15-16.  While in Washington state, Student attended the Washington Public School.  Resp. Ex. 12.; Tr. at 271:16-18.  At the Washington Public School, Student's attendance was sporadic.  Admin. Decision ¶ 2; Resp. Ex. 12 (comment sheets and notes from first grade teacher at the

---

[2/] Plaintiffs' Reply Brief was originally due on April 26, 2010.  At the request of Plaintiffs' counsel, and because of Plaintiffs' counsel's illness, the deadline for the Reply Brief was extended to May 3, 2010.

Washington Public School).  Student also began exhibiting increasingly aggressive behavior including swearing, growling at other students, displaying a lot of anger, disrespect towards school property, and insubordination to school staff.  Id.  When Student was in the second grade, Student was expelled from school for striking a teacher.  Admin. Decision ¶ 3; Resp. Ex. 14 at NN 141; Resp. Ex. 63 at NN 349.  Student's tendency to report things that did not happen or alter the facts of a story had been noted since early childhood.  Resp. Ex. 23 at NN 171; Resp. Ex. 64 at NN 381.

On June 11, 2003, when Student was approximately eight years old, a psychological consultation was conducted by Dr. J. A. Janssen.  Resp. Ex. 13.  Mother was present for part of this examination.  Id. at NN 137 ("I met with the patient privately for half of the appointment, and then invited the patient's biological parents to join us for the remainder.")[3/]  A mental status examination had previously been completed on May 22, 2003. Resp. Ex. 12 at NN 138.  Based on that examination, Dr. Janssen concluded "there appear[ed] to be no obvious deficits in attention, memory, or thought processes."  Id.  Although he cautioned that "the mental status examination conducted was

---

[3/] Dr. Janssen noted that "[Mother] feels that patient is very affectionate toward her, and that his behavioral problems stem primarily from conflict between her and her ex husband." Resp. Ex. 13 at NN 138.

primarily screening in nature." Id.

On November 18, 2003, a psychoeducational evaluation was conducted by the Washington Public School. Resp. Ex. 14; Admin. Decision ¶ 4. Based on the results of this evaluation, Student was deemed eligible for special education as emotionally/behaviorally disabled. Resp. Ex. 14 at NN 150; Admin. Decision ¶ 5. The evaluation explained that "the most appropriate management is to provide individual instruction in an isolated setting so that the threat of violence cannot be effectively used." Id. The evaluation further found that this instructional setting would safeguard teachers and students from intentional and unintentional harm. Id. The Washington Public School repeatedly attempted to contact Mother to gain her input into the evaluation process, but received no response. Resp. Ex. 14 at NN 142 (noting a number of attempts were made by phone and e-mail to contact the biological mother); Admin. Decision ¶ 5.

In October 2004, Student was admitted to a psychiatric hospital in Washington for two weeks because of his behavioral problems. Admin. Decision ¶ 6. Mother was informed by the doctors at the hospital that the Student needed consistency. Id.

B.   Move to Hawai'i

Student moved to Hawai'i in 2005. Tr. at 275:24-25. Mother waited approximately 5 months after her arrival in Hawai'i

6

to register Student for school.[4/]  Mother was aware that Student
was receiving special education at the Washington Public School
and that Student's behavior was so severe that he could not be in
a public school setting.  Tr. at 274:7-25.  However, when Mother
registered Student for school in Hawai'i, she did not inform the
school that Student had received special education in Washington,
nor did she inform the school about his emotional, behavioral,
and disciplinary issues.  Tr. at 472-473; Admin. Decision ¶ 8.
Thus, Student was placed in a regular education fifth grade
classroom at the DOE Elementary Home School.  Id.; Admin.
Decision ¶ 9.

On September 2, 2005, the DOE Elementary Home School
Principal received Student's records from the Washington Public
School.  Tr. at 474-75; Admin. Decision ¶ 12.  The DOE Elementary
Home School Principal was very concerned about Student's
educational and behavioral history at the Washington Public
School.  Id.  The DOE Elementary Home School Principal
immediately contacted the special education teacher and student

---

[4/] On direct examination, Mother testified that Student came
back to live with her in March 2005, and she immediately left for
Hawai'i.  Tr. at 275:16-23.  However, on cross examination,
Mother indicated that she meant Student came to live with her in
May and that they moved to Hawai'i in June.  Tr. at 367:7-368:5.
Because this issue involves the credibility of the witness, the
Court gives due deference to the finding of the Hearing Officer
as the Hearing Officer "who receives live testimony is in the
best position to determine issues of credibility."  See Amanda J
v. Clark County School Dist., 267 F.3d 877, 889 (9th Cir. 2001).

services coordinator at the DOE Elementary Home School.  Tr. at 475; Admin. Decision ¶ 13.

On September 8, 2005, Mother admitted Student to the Hospital because of his increasingly aggressive and angry behavior at his family for several weeks prior to the admission. Resp. Ex. 16; Admin. Decision ¶ 14.  At one point during his hospitalization, Student had to be placed in seclusion because of his aggressive and hostile behavior toward another patient. Resp. Ex. 16 at NN 157; Admin. Decision ¶ 15.  Student's condition at the Hospital gradually stabilized with medication and treatment, and on September 16, 2005, Student was discharged. Resp. Ex. 16 at NN 155; Admin. Decision ¶ 16.

On September 21, 2005, an IEP meeting was held with Mother at the DOE Elementary Home School to discuss programming for Student.  Tr. at 476; Admin. Decision ¶ 17.  On September 26, 2005, another IEP meeting was held because the DOE Elementary Home School had received additional information from the Hospital regarding Student's needs.  Tr. at 478; Admin. Decision ¶ 19.[5] As a result of this IEP, Student was placed in the DOE Therapeutic Classroom.  Tr. at 478;  Admin. Decision ¶¶ 19-20.

---

[5] The Court notes that the Hearing Officer found "On September 21, 2005, another IEP meeting was held" (¶ 19) but had previously found "On September 21, 2005, an IEP meeting was held" (¶ 17).  Based on the DOE Elementary Home School Principal's testimony, the Court believes this is a typographical error and that there were two meetings, one on September 21, 2005, and one on September 26, 2005.  See Tr. at 478; 480.

Mother testified that Student's Therapeutic Classroom Teacher, "had a great deal of experience dealing with kids with behavioral issues and learning disabilities.  And she was very compassionate with Nickalas, and really tried hard to work with him on behavioral issues."  Tr. at 286.

As he had in Washington, Student continued to experience attendance problems at school in Hawai'i.  By January 20, 2006, he had been absent for a total of 17 days.  Resp. Ex. 63 at NN 353; Admin. Decision ¶ 21.  By January 30, 2006, a second notice was sent to Mother because Student had missed 22 days of school.  Resp. Ex. 63 at 355; Admin. Decision ¶ 22.  As a result of Mother's inadequate response to these notices, the DOE Elementary Home School Principal visited Student's home.  Tr. at 481-482.  At the home, Mother's boyfriend told DOE Elementary Home School Principal that Mother and Student had moved back to Washington state and that it was uncertain if Mother and Student were ever going to return to Hawai'i.  Id.; see also Resp. Ex. 17 at NN 160 (DOH Psychiatrist report noting that "Nickalas' mother, sister, as well as Nickalas recently moved to Hawaii from Washington state approximately 10 months ago.  They then moved back to Washington three months ago, and recently moved back to Oahu in March of 2006);" Petitioners' Ex. 28 (same document).  Consequently, Student was withdrawn from the DOE Elementary Home School.  Id.

While in the DOE Therapeutic Classroom, Student refused to write, even when aided with a typewriter.  Tr. at 290-292; Admin. Decision ¶ 27.  Student maintained that his hand did not connect to his brain.  Id.  Student's Therapeutic Classroom Teacher expressed concern about Student's behavior.  Id.  Student acted very defiantly and had to be restrained by staff.  Id.

C.   The 2006-2007 School Year

On March 30, 2006, the DOH Psychiatrist evaluated Student and concluded that "[Student] meets the criteria for major depressive disorder, posttraumatic stress disorder, adjustment disorder with mixed emotions and conducts, attention deficit hyperactivity disorder, combined type, enuresis, learning disorder not otherwise specified."  Resp. Ex. 17 at NN 162; Admin. Decision ¶ 26.  The DOH Psychiatrist also noted that "Student needs to have his vision checked, as he probably should be wearing glasses as he has 75% visual loss in his right eye."  Resp. Ex. 17 at NN 163.

On May 31, 2006, an IEP meeting was held.  Petitioners' Ex. 12; Admin. Decision ¶ 28.  At this IEP meeting, an alternative placement at the DOH Day Treatment Program for Children was offered to Mother based on Student's documented progress in the DOE Therapeutic Classroom.  Petitioners' Ex. 12 at 00122; Admin. Decision ¶ 28.  Mother explained that she was told Student could no longer remain in the DOE Therapeutic

10

Classroom because of his size and age.  Tr. at 289.  Student's Therapeutic Classroom Teacher was concerned that Student's presence was intimidating to the younger, smaller students.  Id.

After considering the proposed placement, Mother accepted Student's placement at the DOH Day Treatment Program for Children and scheduled an intake date with the agency for June 22, 2006.  Petitioners' Ex. 12 at 00120; Admin. Decision ¶ 29. Another IEP meeting was held on August 28, 2006.  Resp. Ex. 4. Mother did not express any concerns at the meeting.  Id. at NN 043; Admin. Decision ¶ 30.  Mother did note that Student has a 75% loss of vision in the right eye and was supposed to wear glasses, but he did not wear them to school.  Id.  Mother indicated that she was going to look into the possibility of getting Student contact lenses.[6]  Id.  At this meeting, Mother requested an academic and cognitive assessment be conducted, which the DOE agreed to perform.[7]  Id.

The August 28, 2006 IEP indicated that the Department of Health (DOH) would provide therapy to Student through the DOH Intensive In-home Therapist.  Id.  The IEP stated that, after 6-9 months, depending on the improvements Student made, the DOH would have to justify its services on a month to month basis.  Id.  The

---

[6] The Administrative Record on Appeal does not provide any evidence that Student ever obtained contact lenses.

[7] The results of this assessment were provided in a Prior Written Notice dated October 17, 2006, discussed infra at 13.

August 28, 2006 IEP noted that the DOH Psychiatrist had ceased providing services because Student was no longer on medication and, thus, did not need of psychiatric services for the purposes of medication management. Id.

On September 20, 2006, the DOE Elementary Home School Teacher observed Student at the DOH Day Treatment Program for Children and reported that:

> [Student] followed directions and classroom rules for the duration of the observation. He responded appropriately when adults spoke to him and did not need re-direction of any kind. He did not seek excessive attention.
> When compared to peers, [Student] responded well to the small group, high teacher ratio in the classroom. He was able to work independently and asked appropriately when he needed help. He was patient when it was appropriate and waited for teachers to come to him when he needed assistance. [Student] appeared to become distracted at times as evidenced by his playing with the eraser and a not stopping his work [sic], but within a short amount of time, [Student] was able to recover and continue to work independently.
> [Student] was appropriate throughout the observation and appeared motivated to learn. He did not show signs of being distractive towards others for this observation.

Petitioners' Ex. 8 at 00078;[8/] Resp. Ex. 5 at NN 050, 063.

In the School Based Behavioral Health Quarterly Progress Report for the quarter ending September 2006, the DOH Day Treatment Program for Children staff noted:

> [Student] has settled into the routine and structure of

_____

[8/] The Hearing Officer cites Petitioners' Ex. 7 in Finding of Fact ¶ 33. The Court presumes this is a typographical error as Exhibit 8 is the correct reference.

the program.  He has shown tremendous improvement in his actions, behaviors, and attitude since the start of the new school year. . . . [Student] continues to struggle with whining and he does not like to be told what to do, or to be told "no."  However, he is aware of the coping skills available to him, and will sometimes accept the suggestion of the staff to use the coping skills.

Respondent's Ex. 23.

On October 16, 2006, another IEP meeting was held. Admin. Decision ¶ 35; Petitioners' Ex. 7 at 00057.  In this IEP, the team observed that "[Student] does come to school on a regular basis, which is helping him make progress in all areas." Id. at 58.  The IEP also explained that "[a]cademically, [Student] has weaknesses in writing and math.  When asked to complete a writing assignment, he has the tendency to get upset. With patience and the use of a graphic organizer, [Student] will make progress."  Id.  Finally, the IEP reported that "[b]ased on a comparison of his cognitive and achievement scores, [Student] is performing within predicted levels in reading, math, and written language."  Id.

A Prior Written Notice ("PWN") dated October 17, 2006, reports on the results of the cognitive assessment mother requested.  Admin Decision ¶ 36; Petitioners' Ex. 8 at 00073; Resp. Ex. 9 at NN 108.  This assessment indicated that Student did not have a "significant discrepancy between his academic and cognitive ability to suggest the possibility of a learning disability."  Id.  The staff and program manager at the DOH Day

13

Treatment Program for Children also indicated that they did not see symptoms of Attention Deficit Hyperactivity Disorder, Combined Type Learning Disorder, or NOS Bipolar Disorder and the PWN reports that "[Mother] is in agreement." Id.

Student continued to make progress at the DOH Day Treatment Program for Children throughout the rest of the 2006-2007 school year. Admin. Decision ¶ 37; Resp. Ex. 23 at NN 171; Resp. Ex. 24 at NN 174 ("[Student] has made improvements with utilizing his coping skills when he gets frustrated . . . [h]e is starting to realize taking a self time out is a good thing for him"). In the Spring of 2007, Student participated in the Hawaii State Assessment. Admin. Decision ¶ 38; Resp. Ex. 38 at NN 223. Student received a score of 309 for reading, which met proficiency. Student received a score of 280 for math, which approached proficiency. Student's math score was approximately 20 points away from meeting proficiency under the No Child Left Behind Law. Admin Decision ¶ 38; Tr. at 520:20-25. In May 2007, Mother was informed that the DOH Day Treatment Program for Children had lost its contract with the DOH. She was thus informed that Student would likely be placed at the successor day treatment program. Admin. Decision ¶ 39.

On June 29, 2007, the DOH Day Treatment Program for Children prepared a discharge summary for Student that stated "[Student] has made improvements at [the DOH Day Treatment

14

Program for Children] this past year. . . . [Student] has the ability to initiate, stay on task and complete his school work when he puts his mind to it." Admin. Decision ¶ 40; Resp. Ex. 26 at NN 179.

D.   The 2007-2008 School Year

At the beginning of the 2007-2008 school year, Student was in the seventh grade; therefore, Student received a new home school, the DOE Intermediate Home School. Admin. Decision ¶ 41. On September 27, 2007, an IEP meeting was held. Admin. Decision ¶ 43; Resp. Ex. 6; Petitioners' Ex. 5. The IEP team determined that Student should be placed at the DOH Community-Based Educational Program, a day treatment program that was set up for elementary school children, because Student was not mature enough to enter the DOH Day Treatment Program for Adolescents. Admin. Decision ¶ 42. Student was the oldest and largest in his classroom at the DOH Community-Based Educational Program. Admin. Decision ¶ 43.

At the DOH Community-Based Educational Program, Student underwent an occupational therapy evaluation on September 26, 2007, to assess his handwriting skills. Resp. Ex. 43 at NN 244. The evaluation was designed to "assess his handwriting" and "address his visual perception skills." Id.  The evaluation found that Student performed within the average range for all tasks, and he had "no significant visual-motor perception

15

concerns."  <u>Id.</u>  The evaluation recommended occupational therapy. <u>Id.</u>  Student's September 27, 2007 IEP provided for 60 minutes per month of direct occupational therapy services and occupational therapy consultation on an as needed basis.  Resp. Ex. 6 at NN 073.

While at the DOH Community-Based Educational Program, when Student became aggressive or oppositional, the Student would be physically held or restrained from behind by a staff member. Admin. Decision ¶ 44.  Mother was informed the staff were trained in administering this type of restraint which was called a "CPI hold."  Admin. Decision ¶ 44.  Student was subjected to this type of physical restraint on a number of occasions at the DOH Community-Based Educational Program, including once when Mother was present.  Admin. Decision ¶ 45.  The DOH Community-Based Educational Program also placed Student in an isolation room when he was being defiant or refusing to do his assignments.  Admin. Decision ¶ 46.  Mother estimated Student was placed in the isolation room between 30 and 50 times.  Admin. Decision ¶ 48. As far as Mother was aware, Student had not been placed in the isolation room for exhibiting any physical aggression towards the staff or other students.  Admin. Decision ¶ 47.  According to Mother, Student was not distressed by the isolation room.  Admin. Decision ¶ 46.  As she reported, in the isolation room he was "happy.  He had his books, he was reading . . . . They brought

16

him snacks." Tr. at 304:16-24.  Mother also testified that, on

one occasion when she was notified that Student was in isolation

because he wouldn't write a paragraph, she told him "Nickalas,

you have five minutes to write that paragraph.  If you don't

write it, and I have to come down to the school, you're going to

be in big trouble." Tr. at 303:7-13.  It then took Student

approximately "two [minutes] to write the paragraph and he was

out of isolation room." Id.

        In April 2008, Dr. Slavin, who is with the DOH,

conducted an evaluation and wrote a consultation report.  On

April 14, 2008, she attended a team meeting at the DOH Community-

Based Educational Program.  Petitioners' Ex. 17 at 000254.  As

part of this report, Dr. Slavin interviewed Mother, Student, DOH

Community-Based Educational Program Therapist, and conducted a

classroom observation of Student.  Dr. Slavin stated that

Student's behavior "has improved considerably and that he used to

be much more aggressive." Id. at 00255.  The report indicates

Mother expressed a desire to see Student in a "more normal

setting," although she had concerns that "putting him back into a

mainstream setting could be too stressful." Id.  The DOH

Community-Based Educational Program Therapist indicated to Dr.

Slavin that Student could control his behavior and that he had

begun to accept more responsibility for his actions.  The DOH

Community-Based Educational Program Therapist further reported

that they had "seen some real progress with [Student] over time in their program," and that he was "hopeful that [Student] will be ready to transition out by the end of the extended school year in July." Id. at 00256.

Student told Dr. Slavin that he "feels ready to be in a regular classroom." Id. at 000256-57. Student explained to Dr. Slavin that when he tries to write something down "my mind goes fast and I lose my idea when I go to write it down." Id. at 00257. Dr. Slavin recommended that a comprehensive plan be developed that includes adequate support for Student's emotional and social needs without unnecessary confinement to a highly restrictive school setting. Petitioners' Ex. 17 at 258-259. Dr. Slavin also recommended:

> Functional Family Therapy (FFT) should be explored before doing the individual trauma therapy or simultaneously. FFT is an evidence-based treatment for youth with disruptive behavior problems that works with the whole family. FFT is generally less frequent and intensive than the home-based work family recently experienced, it is time-limited, and it focuses on improving family relationships and building family strengths.

Id.

E.   Placement for the 2008-2009 School Year

Student's placement at the DOH Community-Based Educational Program was set to expire on July 25, 2008, at the end of the 2007-2008 extended school year. Resp. Ex. 49 at NN 266. Student had received a waiver to remain at the DOH

18

Community-Based Educational Program past his thirteenth birthday
in December 2007 because of Mother's objection to his being in
the program for only a few months.   Id.

On June 8, 2008, Mother received a letter from Melissa
Rosen at Learning Disabilities Association of Hawaii, which
stated "per our conversation on the phone today, it is my
understanding that Academy of the Pacific will be providing
[Student's] education."  Petitioners' Ex. 13 at 00163.  Mother
testified that she had not actually indicated he would be
attending the Academy of the Pacific, but at that point "was
entertaining the idea [of private schools] and doing research on
what was available for [Student]."  Tr. at 391-94.

On June 16, 2008, an IEP meeting was held.  Resp. Ex.
7.  Mother was present and Mother was informed that Student would
not be able to return to the DOH Community-Based Educational
Program because of his age.  Tr. at 543.  The IEP team informed
Mother that placement for Student for the 2008-2009 school year
would likely be at the DOH Day Treatment Program for Adolescents.
Admin. Decision. ¶ 51.  The Defendant asserts the IEP team
however, did not make a final placement for the 2008-2009 school
year, and instead, arranged to have additional assessments
conducted.  Admin. Decision ¶ 51; Tr. at 547; Resp. Ex. 9 at NN
111; Resp. Ex. 11 at NN 125-126.  Mother testified she was told
at the June 16, 2008, meeting that, because of Student's

19

behavior, he would not be able to attend the DOE Intermediate Home School.  Admin. Decision ¶ 51; Tr. at 544.

The DOE Intermediate Home School Principal testified at the hearing that, to her knowledge, the only day treatment program that was available for Student as of June 16, 2009, was the DOH Day Treatment Program for Adolescents.  Admin. Decision ¶ 53.  Mother contacted the district office and was also informed there was no other day treatment programs available for Student.  Admin. Decision ¶ 54.

On June 18, 2008, a treatment plan review was submitted for Student.  Resp Ex. 46.  The treatment plan noted that "In Math, [Student] is functioning at a 5.4/6.0 grade level, he has the ability to be at grade level but has seemed to missed [sic] some key skills in prior years, if he works hard he could be on grade level."  Resp. Ex. 46 at NN 255.  This treatment plan also noted that "[i]n writing, he is functioning at a 5.4/6.0 grade level, he does have the ability to be at grade level but does not put forth the effort, he has improved since last review, however he could have progressed more."  Id.

Because Mother did not agree with the proposed placement at the DOH Day Treatment Program for Adolescents for the 2008-2009 school year, Mother began to look for another placement for Student.  Admin. Decision ¶ 57; Petitioners' Ex. 13 at 00163; Tr. at 391-94.  Mother sent a letter to the DOE

20

Intermediate Home School Principal dated July 2, 2008, which indicated that upon further review of the IEP Mother did not feel it is an acceptable offer of FAPE and she disagreed with the proposed placement for Student.[9/] Petitioners' Ex. 13 at 00160. The DOE Intermediate Home School Principal responded to Mother's letter by letter dated July 16, 2008.  Resp. Ex. 13 at 00158. The DOE Intermediate Home School Principal indicated that she was "happy to schedule an IEP meeting in order for [Mother] to share her concerns with the IEP team." Id.  The DOE Intermediate Home School Principal also indicated the DOE had received a form 4140 from Mother indicating that she was homeschooling Student.  Id. Thus, Mother needed to send a written request in order for Student to be re-enrolled at the DOE Intermediate Home School.[10/] Id.

        Mother wrote a letter dated July 17, 2008, to Fran Jones, the Student Services Coordinator at the DOE Intermediate Home School, indicating that Mother was requesting an IEP and that she was not in agreement with the recommendations for Student's placement.  Petitioners' Ex. 13 at 00157.

        Also, on July 16, 2008, a cognitive assessment of Student was conducted by the DOE Intermediate Home School.

---

        [9/] The Court observes the letter is stamped with a date of July 7, 2008 in the upper right corner of the document.

        [10/] Mother sent the letter requesting that Student be re-enrolled on July 21, 2008.  Petitioners' Ex. 12 at 00155.

Student obtained a score of 138 for verbal comprehension, which placed him in the 99th percentile for verbal comprehension. However, Student did score in the 2nd percentile for processing speed.  Admin. Decision ¶ 57; Resp. Ex. 39.  The staff of the DOE Intermediate Home School had an opportunity to observe and interact with Student during this cognitive assessment.  Admin. Decision ¶ 58; Tr. at 548-552.

In a letter dated July 30, 2008, Mother indicated that the IEP team agreed to wait to have an IEP meeting until the IEP team received the results of this assessment.  Petitioners' Ex. 3 at 00150.  The report of this assessment is also dated July 30, 2008.  See Resp. Ex. 39.

Mother began contacting private schools for placement of Student in July 2008, and enrolled Student at the Private Placement School in late August or early September 2008.  Admin. Decision ¶ 59.

On August 7, 2008, Mother wrote a letter to the IEP team which stated:

> This letter is in regards to Nickalas' recommended placement by the I.E.P. Team.  On July 2, 2008 I wrote a letter to [DOE Intermediate Home School Principal]. In the letter, I stated that after further review of the IEP decision, I do not feel this is an acceptable or appropriate offer of F.A.P.E. and or placement. Since this issue has not been addressed and resolved I am giving my ten day notice of placement.  Nickalas will be starting school at [the Private Placement School] on August 18, 2008."

Petitioners' Ex. 13 at 00144.  The letter is stamped August 11,

22

2008.

The DOE Intermediate Home School Principal replied on August 12, 2008, acknowledging Mother's letter and notifying Mother that such a placement would be a unilateral placement. The DOE Intermediate Home School Principal also explained "[t]hree prior IEP meetings were scheduled to discuss [Mother's] concerns, however, [Mother] cancelled the meetings and rescheduled for Thursday August 14, 2008." Petitioners' Ex. 13 at 00141.

On August 14, 2008, as part of the re-evaluation process, a conference was held at the DOE Intermediate Home School to discuss Student's eligibility and placement. Tr. at 555; Resp. Ex. 40; Petitioners' Ex. 3. Both Mother and Student were present. Resp. Ex. 40 at NN232. The team determined Student was still eligible for special education services under the category of emotional disturbance. At this meeting, DOE Intermediate Home School Principal discussed efforts to create a program that would allow Student to attend the DOE Intermediate Home School. Admin. Decision. ¶ 60; Tr. at 555.

On September 22, 2008, the IEP team met at the DOE Intermediate Home School. Resp. Ex. 8. Mother did not attend this meeting, although she had received notice of it. Resp. Ex. 63 at 377-379. Although Mother testified that she was not aware of this meeting, the Court finds the documents that were mailed

23

to her raise a presumption that she received notice.   See Resp.

Ex. 63 at NN 377-38 (copy of letter dated September 15, 2008,

which states "[e]nclosed is a draft copy of [Student's] annual

IEP along with a meeting announcement for Monday, 9/22, at 2:45

p.m." as well as a copy of a domestic return receipt from the

USPS indicating that the letter was delivered on September 17,

2008, and signed for by Mother.)

       As a result of the assessments conducted in July 2008

and the staff's opportunity to observe and interact with Student,

the IEP team determined that for the 2008-09 school year,

Student:

       will receive special education services in a resource
       setting for math, guidance and homeroom.  He will also
       receive special education support for English, social
       studies, and science in an inclusion setting.  He will
       participate with his regular education peers for an
       appropriate elective, lunch, recess, and all other
       school activities.

Admin. Decision ¶ 62; Petitioners' Exhibit 2; Resp. Ex. 8 at NN

100.  Student would have received these services at the DOE

Intermediate Home School.  Tr. at 555-559.

       Mother was mailed a copy of the September 22, 2008 IEP

and prior written notice on September 23, 2008.  Petitioners' Ex.

3 at 140.

       On February 23, 2009, Student was evaluated by the

Private Psychologist, who concluded that "[Student] is

chronically vulnerable to episodes of task refusal accompanied by

24

swearing or other expressions of frustration . . . . [Student's] intellectual skills are developed to an age-appropriate extent or more, but he has unusual difficulty with mathematics and writing." Admin. Decision ¶ 63; Petitioners' Exhibit 44.

On February 28, 2009, the Private Optometrist examined Student. He determined that Student has a visual processing deficit that adversely affected Student's ability to write. The Private Optometrist was confident that a twelve-month visual information process therapy program would result in Student experiencing a significant improvement in his academics and writing ability. Admin. Decision ¶ 64.

Student experienced some initial difficulties adjusting to the Private Placement School, but has made steady significant academic, behavioral, and social gains at the Private Placement School. Admin. Decision ¶ 65. Student receives academic programming, therapeutic services, and behavioral supports at the Private Placement School. Admin. Decision ¶ 65.

## IV. The Administrative Decision[11]

After three days of hearings and receiving written closing statements, the Hearing Officer concluded that Plaintiffs did not prove by a preponderance of the evidence that the IEP team's determination of placement for Student for the 2006-07,

---

[11] The Administrative Decision contains detailed findings of fact and conclusions of law. This summary is not meant to be exhaustive.

2007-08, and 2008-09 school years was improper.  Admin. Decision
at 19.  The Hearing Officer also found that Plaintiffs did not
prove by a preponderance of the evidence that the DOE had failed
to provide Student with appropriate goals, benchmarks, and
special education and related services.  Id.   The Hearing
Officer concluded that "[t]here was no credible evidence
presented at the hearing which indicated that the special
education and related services identified in the subject IEPs
were inadequate to allow Student to make educational progress or
gains as provided by the subject IEPs."  Id.  Finally, the
Hearing Officer concluded that because Plaintiffs had not proved
that the subject IEPs were inappropriate, they had not
established their entitlement to reimbursement of Student's
Private Placement School tuition.  Based upon the foregoing legal
conclusions, the Hearing Officer decided that Plaintiffs had
failed to prove by a preponderance of the evidence that Defendant
had failed to provide Student with FAPE for the 2006-07, 2007-08
and 2008-09 school years.  Thus, the Hearing Officer ordered that
Plaintiffs' request for relief be denied and that Defendant was
the prevailing party.

## **STANDARD**

          In evaluating an appeal of an administrative decision
under the IDEA, the district court "(i) shall receive the records
of the administrative proceedings; (ii) shall hear additional

evidence at the request of a party; and (iii) basing its decision
on the preponderance of the evidence, shall grant such relief as
the court determines is appropriate."  20 U.S.C. §
1415(i)(2)(C).[12/]

This statutory requirement "that a reviewing court base
its decision on the 'preponderance of the evidence' is by no
means an invitation to the courts to substitute their own notions
of sound educational policy for those of the school authorities
which they review."  See Bd. of Educ. of the Hendrick Hudson
Cent. Sch. Dist., Westchester County v. Rowley, 458 U.S. 176, 206
(1982).  Rather, "due weight" must be given to the findings in
the administrative proceedings.  Id.

The amount of deference given to an administrative
hearing officer's findings is a matter of discretion for the
court.  See Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d
884, 891 (9th Cir. 1995) (quoting Gregory K. v. Longview Sch.
Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)).  The court must
consider the findings carefully and endeavor to respond to the
hearing officer's resolution of each material issue, but the
court is free to accept or reject the findings in part or in
whole.  See Capistrano, 59 F.3d at 891.  When exercising its
discretion to determine what weight to give the hearing officer's

---

[12/] Neither party has requested this Court receive additional
evidence.

findings, the court may examine the thoroughness of those findings and accord greater deference when the findings are "thorough and careful."  Id.; Union Sch. Dist. v. Smith, 15 F.3d 1519, 1524 (9th Cir. 1994).

A court's inquiry in reviewing administrative decisions under the IDEA is twofold.  "First, has the State complied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?  If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."  Rowley, 458 U.S. at 206-207 (internal footnotes omitted); see also Smith, 15 F.3d at 1524.

Alternatively stated, the IDEA requires that individuals with disabilities be offered a FAPE that emphasizes special education, is designed to meet the unique needs of the Student, and will prepare the Student for further education, independent living and employment.  20 U.S.C. § 1400(d)(1).  An education is appropriate if it "(1) addresses [the student's] unique needs; (2) provides adequate support services so [the student] can take advantage of the educational opportunities; and (3) is in accord with the individualized education program."  Capistrano, 59 F.3d at 884, 893; see also Rowley, 458 U.S. at 188-89.  The Ninth Circuit has recently affirmed that "[t]he

28

proper standard to determine whether a child has received a free appropriate public education is the 'educational benefit' standard set forth by the Supreme Court in Rowley," and further noted that

> [s]ome confusion exists in this circuit regarding whether the Individuals with Disabilities Education Act requires school districts to provide disabled students with "educational benefit," "some educational benefit" or a "meaningful" educational benefit." See, e.g., Hellgate, 541 F.3d at 1212-13. As we read the Supreme Court's decision in Rowley, all three phrases refer to the same standard. School districts must, to "make such access meaningful," confer at least "some educational benefit" on disabled students. See Rowley, 458 U.S. at 192, 200, 102 S.Ct. 3034. For ease of discussion, we refer to this standard as the "educational benefit" standard.

J.L. v. Mercer Island School Dist., 592 F.3d 938, 951 n.10 (9th Cir. 2010).

In looking at the educational benefit, the Court looks broadly at the Students academic, social, health, emotional communicative, physical, and vocational needs.  Seattle School Dist., No. 1 v. BS., 82 F.3d 1493, 1498 (9th Cir. 1996).  An appropriate education "does not mean the absolutely best or 'potential-maximizing' education for the individual child." Gregory K., 811 F.2d at 1314.  Rather, the state must only provide "a basic floor of opportunity" for the student.  Id. Furthermore, although a family's preferred schooling may be more beneficial for the student than the DOE's proposed placement, this alone does not make the DOE's placement inappropriate.

Gregory K., 811 F.2d at 1314.

The party challenging the administrative decision in an IDEA case has the burden of proof before the District Court. Seattle School Dist., No. 1, 82 F.3d at 1498.[13/]

## DISCUSSION

Plaintiffs appeal the Hearing Officer's conclusion that Defendant provided student with a FAPE for school years 2006-07, 2007-08, and 2008-09 and his conclusion that the DOE offered Student Placement in the Least Restrictive Environment for school years 2006-07, 2007-08, and 2008-09.  See Opening Br. at 5-6.

Plaintiffs argue 1) that the DOE inappropriately focused on Student's behavioral issues and did not recognize Student's unique needs, specifically his writing deficit and the relationship between the Student's academic needs and his behavior; 2) that the placement proposed for the 2008-09 school year was not a FAPE in the least restrictive environment; 3) the Hearing Officer failed to consider Plaintiff's claim that the DOE failed to assess the Student in all areas of suspected disability; and 4) Student's placements in 2006-07 and 2007-08 were not appropriate settings for the Student and were thus not a FAPE.

_____

[13/] Similarly, the burden of proof in an administrative hearing challenging an IEP is placed upon the party seeking relief.  Schaffer v. Weast, 546 U.S. 49, 62 (2005).

I.   **Focus on Behavioral Issues & Alleged Failure to Assess the Student in All Areas of Disability**

The Court rejects Plaintiffs' argument that the DOE inappropriately focused on Student's behavioral issues and did not recognize Student's unique needs, specifically his writing deficit and the relationship between the Student's academic needs and his behavior. The Court also rejects Plaintiffs' argument that the DOE failed to properly assess Student in all areas of disability.[14]

The Record is replete with numerous examples of Student's behavioral issues. From a very young age Student has exhibited the tendency to act out and become violent. Student's violent behavior is not limited to circumstances in which he is required to write. See Resp. Ex. 14 at NN 141; Resp. Ex. 63 at NN 349 (Student expelled from Washington Public School for striking a teacher, the impetus for which appeared to be teacher's redirection of Student to the end of the lunch line).

Student was hospitalized in 2005 "after escalating aggressive and angry behavior at his family for the last several

_____

[14] Plaintiffs assert that the "issue of whether the DOE failed to properly evaluate the Student was not ruled upon by the Hearings Officer." Opening Br. at 18. The Court finds that this argument was implicitly ruled upon because it is encompassed within the Hearing Officer's determination that a FAPE was provided. The Hearing Officer further made specific factual findings regarding the Private Optometrist's examination. See Admin. Decision ¶ 64. However, as Plaintiffs wish to appeal this issue, the Court reviews the issue de novo, but reaches the same conclusion as the Hearing Officer.

weeks prior to admission." Answering Br. at 6-7; Resp. Ex. 16.

At the hospital, Student had to be placed in seclusion because of his aggressive and hostile behavior toward another petient. Id.

Numerous psychologists and psychiatrists have also observed Student's behavior issues. On July 11, 2003, Dr. Janssen (in Washington) remarked that he was hesitant to make a diagnosis of Oppositional Defiant Disorder, even though the patient demonstrated many of the criteria, because a formal diagnostic label may adversely effect how he is treated by other authority figures (i.e. school staff, counselors, etc.) Resp. Ex. 13 at NN 139. While at the Hospital in 2005, Student saw someone in the psychology department. Full testing could not be completed because of Student's lack of participation, but the preliminary evaluation revealed that Student "did show some aggressive tendencies and some lack of empathy and primitive defenses." Resp. Ex. 16 at NN 157-58. On March 30, 2006, the DOH Psychiatrist concluded that [Student] shows significant behavioral, emotional, social and academic difficulties." Resp. Ex. 17 at NN 162.

Plaintiffs fail to establish by a preponderance of the evidence that it was unreasonable for the DOE and IEP team to conclude that Student's behavioral issues were not a result of a learning disability. At Mother's request, a cognitive assessment was conducted in the Fall of 2006, and the evaluation indicated

that Student did not have a "significant discrepancy between his academic and cognitive ability to suggest the possibility of a learning disability." Petitioners' Ex. 8 at 00073; Resp. Ex. 9 at NN 108. Furthermore, the staff and program manager at the DOH Day Treatment Program for Children indicated that they did not see symptoms of Attention Deficit Hyperactivity Disorder, Combined Type Learning Disorder, or NOS Bipolar Disorder. Id. The Prior Written Notice also details that "[Mother] is in agreement." Id.

Student also underwent an occupational therapy evaluation in September 2007, which was designed to assess his handwriting and address his visual perception skills. That evaluation found that Student performed within the average range for all tasks and that he had "no significant visual-motor perception concerns." Resp. Ex. 43 at NN 244. Finally, on February 28, 2009, the Private Optometrist examined Student and concluded that he has a visual processing deficit that adversely affected Student's ability to write. Admin. Decision ¶ 64. This examination, however, is subsequent to all of the IEPs that Plaintiffs have challenged. It is also contradictory to the earlier reports received by the DOE, discussed above.

The Private Optometrist's conclusion that Student has a learning disability is also contradicted by Student's ability to complete work when he puts his mind to it and his statement that

33

he "loses his thoughts" when he goes to write them down.  See Petitioners' Ex. 18 at 00257 (Student told Dr. Slavin he thought he might have problems writing because "my mind goes fast and I lose my idea when I got to write it down.");[15/] Tr. at 303:7-13 (Mother testified that one time Student was in isolation for failing to write a paragraph and she told him "Nickalas, you have five minutes to write that paragraph.  If you don't write it, and I have to come down to the school, you're going to be in big trouble."  It then took Student approximately "two [minutes] to write the paragraph and he was out of isolation room."); Resp. Ex. 26 at NN179 (discharge summary dated June 29, 2007 noted that "[Student] has the ability to initiate, stay on task and complete his school work when he puts his mind to it.".

Based upon the prior evaluations, the Court concludes that the DOE did not inappropriately focus on Student's behavior. The Court further concludes that Plaintiffs have not shown that it was a violation of FAPE for the DOE to not have had Student examined by an optometrist prior to this date.  Student showed ample behavioral issues, and based upon observation and test results, the evidence at the time the IEPs were created does not

---

[15/] As the DOE argues, Student contradicts Plaintiffs' argument that Student is unable to write because of a visual perception problem.  Student stated that he loses his thoughts when he goes to write them down; a graphic organizer, which the IEPs had called for, helps with organizing one's thoughts so that they can be written down.  See Petitioners' Ex. 7 at 00057.

indicate Student had a learning disability based on a visual processing deficit.  Based upon, <u>inter alia</u>, an Intellectual Assessment conducted by Richard Grybowski, M.Ed, a Psychological Examiner, and the observations of the staff and program manager at the DOH Day Treatment Program for Children, the IEP team specifically concluded that Student did not have a learning disability.[16/]  <u>See</u> Petitioners' Ex 8 at 00073; Resp. Ex. 9 at NN108.  Furthermore, although Plaintiffs argue that "the DOE, and the Hearings Officer, both erroneously concluded that the Student's behavior needed to be addressed first, then his academics" (Opening Br. at 12), the Court does not find any such apparent dichotomy.  The DOE addressed both behavior and education.  Student's behavior was a focus, however, his academic progression was always a priority and Student achieved academic progress.  Thus, the Court finds that the DOE did not ignore Student's "unique needs, specifically his writing deficits and the relationship between the Student's academic needs and his

---

[16/] In greater detail, the PWN provides a "Description of the evaluation procedures, test, records, or reports used as a basis for the proposed/refused action" as follows: "Standard Hawaii State and Federal guidelines were followed for the evaluation procedure.  The following were used as a basis for the actions being taken: Classroom Observation[,] Woodcock-Johnson III, Tests of Cognitive Ability Woodcock Johnson III [sic], Tests of Achievement[,] Progress reports for academics[,] Progress reports for behavior[,] Verbal Information from Mrs. Newman, Ms. Comer, Ms. Lamoreux, Ms. Daly-Rath, Ms. Catanzary, Ms. Ramill, and Ms. Fanning[,] Review of diagnosis from Dr. Chan[,] Mental Health treatment plan."  Resp. Ex. 9 at NN 108; Petitioners' Ex. 8 at 00073.

behavior."  Opening Br. at 8-9.  The DOE analyzed Student and reached a different, but entirely reasonable, conclusion regarding Student's behavior.

Plaintiffs quote the extensive requirements of 20 U.S.C. § 1414 regarding evaluations in support of their argument that the DOE did not have Student properly evaluated for a learning disability.  Plaintiffs assert:

> The DOE was told by Plaintiff that the Student complained that 'his hand does not connect to his brain.'  The DOE should have known of the connection between the Student's difficultly with writing and his sometimes explosive behavior.  Despite this, the DOE failed to evaluate the Student for any visual processing deficits. The Hearings Officer erred in failing to find that the DOE denied the Student a FAPE by properly and timely evaluating him in all areas of suspected disability.

Opening Br. at 22.  The Court is not persuaded by this argument. As detailed above, the DOE tested Student and concluded that Student did not have a learning disability.  See Resp. Ex. 9 at NN 108 (report of the DOH Day Treatment Program for Children that they did not see any evidence of a learning disability); Resp. Ex. 43 at NN 244 (results of occupational therapy evaluation on September 27, 2007, noting that Student had "no significant visual-motor perception concerns").  There is ample support in the Record for the DOE's conclusion.  The CFR does not mandate that the DOE send every student to every specialist possible in order to rule out every potential diagnosis that could theoretically affect students especially if there are no

36

indications students are suffering from a disorder.

In any event, the Court finds that the DOE's conclusion that Student's behavior needed to be addressed in an intensive environment in order for his educational needs to be met was reasonable.  Thus, the Court will not substitute its judgment on educational policy for the judgment of the many professionals and school authorities who examined Student.  See Rowley, 458 U.S. at 206 (explaining that Congress did not "invit[e] . . . the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.").

## II.  Proposed Placement for the 2008-09 School Year

Plaintiffs also argue that the proposed placement for the 2008-09 school year was not a FAPE in the least restrictive environment.  Plaintiffs assert that the Hearing Officer erroneously found that "the IEP team did not make a final placement determination [on June 16, 2008] for SY08-09, and instead, arranged to have additional assessments conducted." Opening Br. at 13.  This Court concludes that the Hearing Officer's conclusion is not erroneous.  As Plaintiffs explain immediately after quoting the above finding, "it is true that the DOE agreed to conduct its triennial assessment of the Student." Plaintiffs then argue that the DOE did make a "placement decision."  However, Plaintiffs omit a key word, "final."

37

Although it was a placement, the Record supports a
finding that the June 16, 2008 IEP was not intended to be a final
IEP for the 2008-2009 school year, but rather that the team was
willing to work on Student's placement in response to the results
of the assessments requested and Mother's concerns.  The
conference announcement for the August 14, 2008 IEP meeting
indicates that the team was still "determin[ing] educational
placement."  Resp. Ex. 10 at NN 117.  Furthermore, there was an
ongoing dialog between the school and Mother regarding placement.
After Mother sent a letter expressing her concerns with the June
16, 2008 IEP, the DOE Intermediate Home School Principal
responded that she would be happy to schedule an IEP meeting for
Mother to express her concerns; three such meetings were
scheduled, but subsequently cancelled by Mother.  Petitioners'
Ex. 13 at 00160, 00144.  Another letter indicates that the IEP
team agreed to wait to have the IEP meeting until the team had
received the results of the assessments conducted in July 2008.
Petitioners' Ex. 3 at 00150.  A conference was held on August 14,
2008, as part of the re-evaluation process, and Student's
placement continued to be discussed.  The DOE Intermediate Home
School Principal testified at the hearing that, as a result of
Student's behavior at testing and the results of the July 2008
assessment, she began to think about bringing Student back to the
DOE Intermediate Home School for his eighth grade year.  Tr. at

38

552-53.

Plaintiffs argue that "[i]t was only after Plaintiff placed the Student at the Private Placement school, did the DOE change its position and offer placement at Intermediate Home School." Opening Br. at 15-16; Reply Br. at 6. However, the DOE Intermediate Home School Principal testified that she discussed the "thought process" as to Student's placement with Mother in August. Tr. at 555. That thought process included consideration of whether Student was ready to return to the DOE Intermediate Home School and, if he was, what would his schedule look like and what accommodations were necessary. Id. at 551-555. She further testified that the June 16, 2008, meeting was to discuss whether Student had "made adequate progress to go to a lesser restrictive environment. And if so, where would that be. Or was he not ready to be completely discharged. And if so, where would he go since he had aged out of [the DOH Community-Based Educational Program]." Tr. at 543. She explained that there was a need for a transition period for a student returning to the home school from an off-campus placement. Tr. at 556-57. The DOE Intermediate Home School Principal categorically denied that the discussion about bringing Student back to the DOE Intermediate Home School was in response to Mother's Due Process complaint.[17/]

_____

[17/] The DOE Intermediate Home School Principal specifically testified that, at the August 14, 2008 meeting, Mother's response
(continued...)

39

Tr. at 555.

The proposed placement at the DOE Intermediate Home
School was the type of placement both Mother and Student
specifically indicated that they desired.  Petitioners' Ex. 18 at
00258.  It was also the type of placement that was recommended by
Dr. Slavin, a DOH behavioral specialist who examined Student in
May 2008.  She proposed that Student be placed in a "more
mainstreamed environment" with more opportunities to interact
with positive peers.  Opening Br. at 31 (citing Petitioners' Ex.
18 at 00258).

Although Student's placement at the DOE Intermediate
Home School was set forth in the IEP dated September 22, 2008,
and the PWN dated September 24, 2008, which are after the school
year had begun, the Court finds that under the circumstances of
this case, where, as early as June, there were ongoing
discussions regarding placement in response to Mother's concerns,
a reassessment of Student's cognitive and academic skills, and a

_____

(...continued)
to the discussion about potential placement at the DOE
Intermediate Home School was "I find it ironic that you have done
this [begun to consider placement at the DOE Intermediate Home
School] at this time and feel that it is in response to the fact
that I filed Due Process."  Tr. at 555.  The Court notes that
this placement was exactly the type of placement Mother indicated
she desired (Petitioner's Ex. 18 at 00258) and that, although
Mother had given prior notice of her intended placement of
student at a private institution in early August, Mother's
Impartial Due Process Hearing Request was not filed until
November 7, 2008.  Administrative Record on Appeal at 1.

reevaluation of Student's behavior, there was no denial of FAPE based upon the delay.  This Court has previously held, "the DOE's failure to have an IEP in place in the beginning of each school year results in a denial of FAPE." <u>D.C. v. Dep't of Educ.</u>, 550 F. Supp. 2d 1238 (D. Haw. 2008) (citing <u>Dep't of Educ. v. E.B.</u>, No. 05-00543, 2006 WL 1343681, *7 (D. Haw. May 15, 2006); 20 U.S.C. § 1414(d)(2)(a) (requiring an educational agency to have an IEP in effect at the beginning of the school year); <u>Gadsby v. Grasmick</u>, 109 F.3d 940, 950 (4th Cir. 1997)).  However, in determining whether a school district owed parents reimbursement for their children's placement while the school district conducted evaluations, the Ninth Circuit looked at the reasonableness of the school district's action.  <u>JG v. Douglas County School Dist.</u>, 552 F3d 786 (9th Cir. 2008).  The Ninth Circuit held that a one-month delay between notice of a suspected disability and testing for the disability was not unreasonable because that delay was essential to produce valid test results. <u>Id.</u>

Similarly, here, the Court finds that any delay in Student's placement for the 2008-09 school year was due to the re-assessment being conducted at Mother's request and also due to Mother's cancellation of three scheduled IEP meetings. Petitioners' Ex. 13 at 00141.  Furthermore, the Court finds that Plaintiffs have not proven by a preponderance of the evidence

that the temporary placement of Student at the DOH Day Treatment Program for Adolescents would have been inappropriate.  Student had aged out of the prior day treatment program and this was the next day treatment program available.  As the DOE Intermediate Home School Principal testified, a student needs to be transitioned from a more restrictive environment back to the home school campus.  Thus, in the absence of any evidence to the contrary, a temporary placement at the DOH Day Treatment Program for Adolescents would likely have served to aid Student's transition from the more restrictive environment of a day treatment program to a program where Student would be receiving services at the Home School, even though such a placement would involve Student moving twice.  In light of the foregoing, the Court agrees Plaintiffs have not met their burden of showing that the DOE failed to offer Student a FAPE for the 2008-2009 school year.

### III. Student's Placements in 2006-07 and 2007-08

Plaintiffs also argue that Student's placements for the 2006-07 and 2007-08 school years were inappropriate.  The Court rejects these arguments.  As explained by the Ninth Circuit, in order to "'make such access meaningful,'[an IEP must] confer at least 'some educational benefit' on disabled students." Mercer Island, 592 F.3d at 951 n.10. (citing Rowley, 458 U.S. at 192, 200, 102 S.Ct. 3034.)  The Ninth Circuit has additionally

42

explained, a court should "look to the [IEP's] goals and goal
achieving methods at the time the plan was implemented and ask
whether these methods were reasonably calculated to confer [the
student] with a meaningful benefit." Adams v. State of Oregon,
195 F.3d 1141, 1149 (9th Cir. 1999).  The Adams Court further
quoted a Third Circuit case which stated:

> Actions of the school systems cannot ... be judged
> exclusively in hindsight.... [A]n individualized
> education program ("IEP") is a snapshot, not a
> retrospective. In striving for "appropriateness," an
> IEP must take into account what was, and was not,
> objectively reasonable when the snapshot was taken,
> that is, at the time the IEP was drafted.

Id. (quoting Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d
1031, 1041 (3d Cir. 1993) (citations omitted)).  Thus, "the court
must examine the IEP prospectively, rather than retrospectively."
See B.V. v. Dep't of Ed., State of Hawaii, 451 F. Supp. 2d 1113,
1126 (D. Haw. 2005); see also JG v. Douglas County School Dist.,
552 F.3d 786, 801 (9th Cir. 2008) ("we consider the IEP at the
time of its implementation, not in hindsight, and ask if its
methods were reasonably calculated to confer an educational
benefit on the child.").

        Looking at the 2006-07 and 2007-08 school year IEPs
prospectively, the Court finds that they were appropriate.
Mother's subsequent complaints about the placements do not
persuade the Court that at the time the IEPs were created they
were inappropriate.  Nor is the Court persuaded that Student did

not receive a meaningful benefit or was unable to make productive use of what he learned.  Seattle School Dist. No. 1, 82 F.3d at 1500-01 (explaining that "[c]ontrary to the School District's assertion, the district court and ALJ did not require the School District to provide the 'best' or 'potential-maximizing' education. Rather, they found that A.S. was unable to derive any meaningful educational benefit from her past education and that the School District's new proposal was similarly unlikely to provide educational benefit . . . . the ALJ found that A.S.'s educational progress was actually deteriorating and that she was unable to make productive use of what she learned.")

First, the Court notes that, although Mother may now be complaining that she didn't really want to agree to these placements, she did agree to the 2006-07 and 2007-08 placements at the time they were made.  Second, Student's case required educators and other team professionals to make some difficult balancing decisions in determining Student's placement.  On the one hand they had to balance, inter alia, Student's physical size and age, his immaturity, his behavioral issues, and his academic issues.  These are not decisions this Court will lightly second-guess based upon hindsight.

Mother appears to be complaining that Student was being

44

placed in a setting for which he was physically too big;[18] yet, at the same time, when informed in June of 2008 that Student's placement for the 2008-2009 school year would likely be the DOH Day Treatment Program for Adolescents, she disagreed with that potential placement because she felt he was too immature. Compare Opening Br. at 33-34 (citing Tr. at 342-343 where Mother is expressing concern that Student is too socially immature to be placed at the DOH Day Treatment Program for Adolescents) with Opening Br. at 27-28 (citing Mother's testimony that the desks in the DOH Community-Based Educational Program were kindergarten sized and that Student was the oldest in the class).  The Court again notes, however, that these decisions were made upon balancing Students immaturity, behavioral issues, size, age, and academic levels.  Plaintiffs have not shown by a preponderance of the evidence that these decisions were not reasonably calculated to provide Student with a meaningful educational benefit at the time they were made.  Furthermore, the Record demonstrates that Student did in fact receive an educational benefit from these IEPs.[19]

---

[18] The Court observes that Dr. Slavin observed Student in this classroom.  She observed that he was approximately twice the size of the other students, but did not make any comments on the size of the furniture in the classroom.  Petitioners' Ex. 17 at 256-57.

[19] The Court thus rejects Plaintiffs' assertion that the "DOE must show meaningful improvement in learning, which the
(continued...)

In a Quarterly Progress report dated September 2006, it was noted that Student "ha[d] shown tremendous improvement in his actions, behaviors and attitude since the start of the new school year."  Resp Ex. 23 at NN 171.  In a Quarterly Progress Report dated March 16, 2007, the provider remarked "[Student] has made improvements with utilizing his coping skills when he gets frustrated . . . . [h]e is starting to realize taking a self time out is a good thing for him."  Resp. Ex. 24 at NN 174.  Also in the Spring of 2007, Student participated in the Hawai'i State Assessment and received a score of 309 for reading, which met proficiency, and 280 for math, which approached proficiency. Resp. Ex. 38.  Finally, in a Quarterly Progress Report dated July of 2008, it is noted that

> [i]n math Nick is functioning at a 5.4/6.0 grade level, he has the ability to be at grade level but has seemed to missed [sic] some key skills in prior years, if he works hard he could be on grade level . . . . In writing, he is functioning at a 5.4/6.0 grade level. He does have the ability to be grade level but does not put forth the effort, he has improved greatly in this area since entering [the DOH Community-Based Educational Program] in August of 2007, when he refused to write at all.

Petitioners' Ex. 17 at 00251.  Thus, the Court concludes that Student has received a meaningful educational benefit.

_____

(...continued)
record on appeal is simply unable to substantiate."  Reply Br. at 3.  The Court finds ample evidence in the record that Student was making educational progress and as of July 2008, could be on grade level if he worked hard enough.  See Petitioners' Ex. 17 at 00251.

Mother also complains about the number of times that Student has had to change schools.  However, at least one move could have been eliminated had Mother informed the DOE Elementary Home School at the time she registered Student that Student had been receiving Special Education services in the Washington Home School.  Moreover, there were valid reasons for all of the moves. After being removed from the regular education classroom, Student was placed in the DOE Therapeutic Classroom; however, because of Student's age, size, and behavior he could not remain there. Admin. Decision ¶ 27; Tr. 290-292.  Thus, an alternative placement was made to the DOH Day Treatment Program for Children. Student's move from that placement was necessitated only because the day treatment facility lost its contract with the state; it was not simply a decision to move Student for the sake of moving the Student.  Finally, Student had to be moved from the DOH Community-Based Educational Program because he had aged out of it and had already been given a waiver to remain there beyond his thirteenth birthday so that he could finish out the school year. See Resp. Ex. 49 at NN 266. The Court finds that the number of times Student has moved is not sufficient to show a denial of FAPE.

The Court does not agree with Plaintiffs' argument that the DOE failed to consider Student's need for positive modeling opportunities throughout his school day and instead placed

Student in an environment where punishment was the norm.  Student was placed in an environment designed to work on his anger issues.  Time outs and isolation were strategies designed to help control his anger.  Plaintiffs have not shown by a preponderance of the evidence that these strategies were inappropriate.

Plaintiffs argue that the placements for the 2006-07 and 2007-08 school years did not comply with IDEA requirements relating to placement in the least restrictive environment because the IEP team did not consider the nature of the disabilities of children at the DOH Day Treatment Program for Children and because there was no discussion of how the Student would impact the other children or the other children would impact Student.  Opening Br. at 16-18.  The Court is not persuaded that this is sufficient to establish by a preponderance of the evidence that the IEP team failed to follow IDEA procedures or that the IEP was not the least restrictive placement.[20]  Plaintiffs have not shown that the other children's disabilities at the placement center would have a harmful effect on Student.  See 34 C.F.R. § 300.116; 20 U.S.C. § 1412(A)(5).

In contrast, Defendant has shown that the placements

---

[20] The Court notes the conflicting nature of Plaintiffs' arguments.  At the same time that they argue that the DOE failed to comply with the IDEA requirements relating to the placement of Student in the Least Restrictive Environment, Plaintiffs advocate that the Private Placement School, which is a very restrictive environment, is appropriate.

were the least restrictive placements based on Student's
condition and needs at the time.  Furthermore, Mother agreed with
the 2006-07 and 2007-08 placements at the time they were made.
The DOE Elementary Home School Principal testified that at the
time the IEP team was considering Student's 2006-2007 placement,
the IEP team felt that he needed more intensive services.  Tr. at
485:21-488:13.  The DOE Elementary Home School Principal further
testified that she was aware the DOH Day Treatment Program for
Children had "a more intensive service for students with
behavioral needs.  Again, the ratio of students to teacher is a
smaller number ratio."  Id.  Although she did not personally
visit the site, her "student services coordinator did to make
observations, and it was really a one-to-one type of
individualized setting."[21]  Id.  Finally, the IEP meeting for
Student's 2006-2007 placement included personnel from the DOH Day
Treatment Program for Students, the DOE Elementary Home School,
and the Department of Health, as well as Mother.  Id.  Therefore,
that the DOE Elementary Home School Principal was unaware of the
other children's disabilities does not mean that Student was
denied a FAPE.

        Similarly, Plaintiffs appear to complain that Student

---

[21]  The DOE Elementary Home School Principal also testified
that the DOH Day Treatment Program for Children staff provided
input and feedback on Student's progress at various IEP meetings.
Tr. at 510:13-21.

was moved from the DOH Day Treatment Program for Children to the DOH Community-Based Educational Program, which Plaintiffs did not have an opportunity to visit.  These arguments however, without additional supporting evidence are insufficient to establish by a preponderance of the evidence that this placement was improper.

Thus, the Court finds that Plaintiffs have not proven the DOE did not provide Student with a FAPE for the 2006-07 and 2007-08 school years.

### CONCLUSION

For the foregoing reasons, the decision of the Hearing Officer is affirmed.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, May 21, 2010.



_____
Alan C. Kay
Sr. United States District Judge


Tracy N. v. Dep't of Educ., Civ. No. 09-00513 ACK-LEK: Order Affirming The Hearing Officer's Decision